AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the

JUDGE KAPLAN

Southern District of New York ⊙

| | |
|---|---|
| PHYLLIS DEMBO | **10 CIV 2716** |
| *Plaintiff* | ) |
| | ) |
| MOUNT SINAI HOSPITAL and CLAUDIA COLGAN, individually | ) Civil Action No. |
| | ) |
| | ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  MOUNT SINAI HOSPITAL
1 Gustave L. Levy Place
1190 Fifth Avenue
New York, New York 10029

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

J. MICHAEL McMAHON

CLERK OF COURT

MAR 2 6 2010

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____.

☐ I personally served the summons on the individual at *(place)* _____
on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)* _____
on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $    0    .

I declare under penalty of perjury that this information is true.


Date: _____          _____
                                                      *Server's signature*

                                        _____
                                                      *Printed name and title*


                                        _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

JUDGE KAPLAN

**SACK & SACK, ESQS.**
110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

10 CIV 2716

------------------------------------------------------------x

PHYLLIS DEMBO,

                                     Plaintiff,

               — against —

**MOUNT SINAI HOSPITAL** and **CLAUDIA COLGAN**, individually,

                                Defendants.

ECF CASE

**COMPLAINT**

RECEIVED

MAR 26 2010

**JURY TRIAL REQUESTED**

------------------------------------------------------------x

      Plaintiff, Phyllis Dembo (*"Dembo"* or *"Plaintiff"*) by her attorneys, Sack & Sack, Esqs.,

file the following Complaint against Mount Sinai Hospital ("*Mount Sinai*") and Claudia Colgan

("*Colgan*", together with Mount Sinai, *"Defendants"*).

      Ms. Dembo, as and for her complaint, alleges as follows:

1

## NATURE OF THE ACTION

1.      Plaintiff complains that her former employer, Mount Sinai, engaged in the unlawful discrimination and subsequent retaliation of Plaintiff in the terms, conditions, and privileges of her employment as follows:

a.      Defendants' continued intentional discriminatory, retaliatory and unlawful termination of Plaintiff's employment due to Plaintiff's disabilities (Lupus and Mixed Connective Tissue Disorder), Defendants' perception that Plaintiff was disabled, and/or Plaintiff's history or record of disability, in violation of the Americans with Disabilities Act of 1990 ("ADA"), New York State Human Rights Law ("*NYSHRL*") and the New York City Human Rights Law ("*NYCHRL*").; and

b.      Defendants' failure to provide Plaintiff with a reasonable accommodation in violation of ADA, NYSHRL and NYCHRL.

2.      Plaintiff files this action to seek monetary relief for the denial of equal employment opportunity and for the unlawful employment practices of Defendant.

3.      Plaintiff further complains that she has suffered, is suffering and will continue to suffer severe economic and non-economic damages because Defendant deprived Plaintiff of her employment rights in violation of federal and state law.

4.      On or about May 23, 2008, Plaintiff filed a timely Charge of Discrimination with the United States Equal Employment Opportunity Commission ("*EEOC*"), which bore charge number 520-2008-03565.

5.     Plaintiff timely brings this action within ninety (90) days of the receipt of a Notice of Right to Sue Letter ("*NORTS Letter*"), issued by the U.S. Department of Justice on December 30, 2009.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under The Americans with Disabilities Act ("*ADA*").

7.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a).  Venue in this matter is properly laid in the District because the violations of the Plaintiff's federal and state civil rights occurred at branch office locations in this District, because the Defendant does business in this District, and because most of the fact witnesses and evidence are common to or most convenient to this District.

8.     Plaintiff served copies of this Complaint upon the New York City Commission on Human Rights and the New York City Corporation Counsel prior to filing it in the United States District Court.

## PARTIES

9.     Plaintiff is an individual who, at all times relevant to this Complaint, has resided and currently resides at 330 West 56th Street, Apartment 25H, New York, New York 10019, County of New York.

10.     At all times relevant herein, Plaintiff was an "employee" within the meaning of ADA, NYSHRL and NYCHRL and thus, afforded protection against disability discrimination and retaliation in employment on the basis of her disability.

3

11.     Mount Sinai is located at 1 Gustave L. Levy Place, 1190 Fifth Avenue, New York, New York 10029 in the County, City and State of New York.

12.     Mount Sinai is a non-profit medical center that provides general in-patient and out-patient care along with acting as a teaching hospital. The Mount Sinai Medical Center includes, but is not limited to Mount Sinai Hospital and the Mount Sinai School of Medicine.`

13.     Mount Sinai employs in excess of six thousand employees.

14.     At all times relevant herein, Mount Sinai's employees, managers, agents and servants, specifically Dr. Mark Chassin, who was Chair of Health Policy and Executive Vice President for the Office of Excellence in Patient Care ("*Dr. Chassin*") and Anne Marie Benedicto, who was the  Administrator, the Department of Health Policy Mount Sinai School of Medicine and the Office of The Executive Vice President for Excellence in Patient Care, The Mount Sinai Medical Center, ("*Ms. Benedicto*") and, Claudia Colgan, RN, who is Vice President for Quality Initiatives ("*Ms. Colgan*"), acted at the behest of Mount Sinai hospital during the course and scope of their employment with Mount Sinai.

15.     At all times material to this action, the Mount Sinai was the plaintiff's "employer" within the meaning of ADA, NYSHRL and NYCHRL.

16.     Defendant Colgan is an employee of Mt. Sinai.

17.     At all relevant times herein, Defendant Colgan was Dembo's supervisor, and in a position to discriminate against Dembo in violation of NYSHRL and NYCHRL.

18.     At all relevant times herein, Defendant Colgan is an individual who either aids, abets, incites, compels or coerces unlawful discriminatory treatment and/or retaliation in violation of the NYSHRL and NYCHRL.

4

## FACTS COMMON TO ALL COUNTS[1]

The claims set forth herein arise from the following set of facts:

**BACKGROUND & DISABILITY**

19.     From May 2007 through October 2007, Ms. Dembo was employed as the Director of Risk Management, Regulatory and Insurance Affairs at the Mount Sinai Hospital.

20.     During her employment with Mt. Sinai, Ms. Dembo suffered discrimination and retaliation based upon her physical disability.

21.     Ms. Dembo suffers from a disability known as Lupus and Mixed Connective Tissue Disorder.

22.     Lupus is a chronic autoimmune disease. Clinically, it can affect multiple organ systems including the heart, skin, joints, kidneys and nervous system.

23.     There are several types of lupus, generally when the word 'lupus' alone is used, it refers to the systemic lupus erythematosus or "SLE." Common initial and chronic complaints of Lupus includes fever, malaise, joint pains, myalgias and fatigue, respiratory symptoms.

24.     Ms. Dembo's disease, Lupus and Mixed Connective Tissue Disorder, is exacerbated by high toxic mold levels commonly found in old buildings with a known history of mold and water damage.

---

1. All directly quoted statements, unless otherwise specified, are the sum and substance of such statements as recalled by Plaintiff.

## MS. DEMBO JOINS MOUNT SINAI

25.     From April 2006 to April 2007, prior to being hired by Mount Sinai, Ms. Dembo was the Director of Risk Management at the Federation of Jewish Philanthropies ("*FOJP*") in a very high salaried position.

26.     One of the FOJP's client hospitals is Mount Sinai.

27.     From January 2007 to April 2007, as a special request to the FOJP, Ms. Dembo was asked to perform services as the Acting Director of Risk Management and Regulatory Insurance Affairs at Mount Sinai.

28.     During that time, Ms. Dembo was deployed to Mount Sinai to assist in restructuring and program development for all aspects of clinical risk management, claims management, and insurance coverages that include broadening of staff skills in conducting root cause analyses in response to sentinel events and other critical clinical incidents, development of departmental guidelines to comply with Federal and State laws and regulations related to requirements for medical malpractice prevention activities and identification and management of critical potentially compensable clinical events.

## DISCLOSURE OF DISABILITY AND PROMISES OF REASONABLE ACCOMMODATION

29.     While Ms. Dembo was serving as Acting Director of Risk Management and Regulatory Insurance Affairs at Mount Sinai on behalf of Mount Sinai, Ms. Dembo was approached by Dr. Chassin and Ms. Colgan, who asked her to consider accepting a full-time position at Mount Sinai as the Director of Risk Management Regulatory Insurance Affairs.

30.     At that time, Ms. Dembo informed Dr. Chassin and Ms. Colgan that she could not accept such a position due to the fact that the physical location of Mount Sinai's Risk Management Department is a building with known environmental hazards, including a toxic mold condition to which she would be physically hypersensitive due to her medical disability.

31.     The Risk Management Department was physically located at 19 East 98th Street, New York, New York (the "*Toxic Location*").

32.     Specifically, Ms. Dembo disclosed to Dr. Chassin and Ms. Colgan that she suffered from previous exposure to toxic mold levels that resulted in a hypersensitivity condition to toxic molds and chemicals, Lupus and Mixed Connective Tissue Disorder, which made her more highly susceptible to harm as a result the toxic mold levels in the Toxic Location of the Risk Management Department.

33.     In response to the disclosure of her physical disability, Dr. Chassin assured Ms. Dembo that Mount Sinai would accommodate her disability.

---

**OFFER LETTER CONTAINS WRITTEN PROMISE OF ACCOMMODATION**

---

34.     Dr. Chassin agreed to memorialize in writing his promise to accommodate Ms. Dembo's physical disability.

35.     Specifically, upon her hire on or around March 21, 2007 as the Director of Risk Management, Regulatory, and Insurance Affairs for Mount Sinai, which was conditioned upon Mount Sinai providing Ms. Dembo with a reasonable accommodation that she not be exposed to the Toxic Location that contained dangerous toxic levels to someone with her physical disability, Ms. Dembo was provided with a letter that contained an acknowledgment by Mount Sinai of the

disclosure of her physical disability and their agreement to provide her with a reasonable accommodation (the "*Offer Letter*", Exhibit "A").

36.     In her Offer Letter, Mount Sinai confirmed that, **"Your employment is also contingent on the receipt of appropriate medical documentation outlining your condition and office space requirements, as well as Mount Sinai's ability to reasonably accommodate you."** (Exhibit "A")

37.     The Offer Letter further provided that, **"Your workspace will not be in 19 East 98th Street [the Toxic Location], which is where Risk Management staff is currently located.  Thus, adaptive measures are required that will still allow you to directly monitor, coach, and supervise their work.  These include, but are not limited to, weekly staff meetings, set office hours, and one-on-one work with staff.  In addition, your job responsibilities include attending meetings and investigating occurrences throughout the Medical Center."** (Exhibit "A")

38.     Accordingly, pursuant to the Offer Letter, Mount Sinai acknowledged that Ms. Dembo's employment was conditioned upon the provision of a reasonable accommodation and did indeed agree to provide that accommodation so that she would not be required to expose herself to the building where Risk Management was located and where the toxic mold condition existed (*i.e.*, the Toxic Location) that would exacerbate her physical disability.

39.     Mount Sinai acknowledged that Ms. Dembo's duties, which were outlined in the Offer Letter, could be performed with the provided accommodation.

40.     Consequently, Mount Sinai agreed to provide Ms. Dembo with an office separate and apart from the Toxic Location, and provided for office hours where her Risk Management staff, which was situated in the Toxic Location, would be able to visit her.

41.     Based upon both the written and verbal promises, representations and assurances of a reasonable accommodation by both Dr. Chassin and seemingly Ms. Colgan, upon which Ms. Dembo reasonably relied to her detriment, Ms. Dembo agreed to resign her secure position at FOJP and become the Risk Manager for Mount Sinai pursuant to the terms, conditions and privileges promised by Dr. Chassin and set forth in the Offer Letter.

42.     Though Mount Sinai agreed to provide me with a reasonable accommodation at the recommendation of Dr. Chassin, Ms. Dembo did not believe that Ms. Colgan was in agreement to the reasonable arrangement that the accommodation provided since she indicated that other people with similar autoimmune disorders worked in the "Toxic Location" without problems.

### DR. CHASSIN RESIGNS

43.     On or about May 25, 2007, within a week of Ms. Dembo arriving in her new position as the Director of Risk Management of Mount Sinai and after giving up a secure position with FOJP, Dr. Chassin informed her that he had been nominated as President for a position outside Mount Sinai and **"would probably be leaving Mount Sinai."**

44.     Upon hearing of Dr. Chassin's announcement of his nomination, Ms. Dembo expressed alarm and advised Dr. Chassin that she did not feel that Ms. Colgan felt the same way

as Dr. Chassin did in providing Ms. Dembo with a reasonable accommodation concerning her disability.

45.     In fact, by that time, Ms. Colgan had already scheduled meetings with Ms. Dembo in the "Toxic Location" despite the existence of her reasonable accommodation, which Ms. Colgan was fully aware of.

46.     Dr. Chassin assured Ms. Dembo both verbally and in writing that he would make certain that, **"Ms. Colgan would not retaliate against you and would abide by the ADA accommodation which prohibited Mount Sinai from requiring you to go to the building where the toxic mold condition existed."**

| MS. DEMBO SUFFERS DISCRIMINATION AND RETALIATION |
|---|

47.     Despite Dr. Chassin's assurance, promises and representations to the contrary, on or about June 1, 2007, immediately upon Dr. Chassin's announcement of his departure from Mount Sinai, Ms. Colgan commenced a pattern of harassment and intimidation against Ms. Dembo on the basis of her physical disability and in retaliation to Ms. Dembo receiving and accepting a reasonable accommodation from Mount Sinai.

48.     On or about June 5, 2007, Ms. Colgan erroneously claimed that Ms. Dembo was not performing certain job duties, even though her Offer Letter specifically set forth that those duties were not within the scope of Ms. Dembo's employment.

49.     Subsequent to and thereafter, Ms. Colgan began requiring Ms. Dembo to attend meetings in the Toxic Location despite that Ms. Colgan was fully aware of the dangers to Ms. Dembo of toxic exposure and illness in the Risk Management Building.

50.     Notably, during the period of late May 2007 through June 2007, two of Ms. Dembo's Risk Management Staff was still located in the Toxic Location and filed written complaints regarding physical ill-effects while residing in the Toxic Location.

51.     As a result, on or about mid-June 2007, the Risk Management Department was evacuated from the Toxic Location where they remained until after Labor Day (on or about September 5, 2007).

52.     During this interim period, the Risk Management staff was relocated to a space separate and apart from the Toxic Location to an area directly below Ms. Dembo's "accommodated" Office as Director for Risk Management.

53.     Since Ms. Dembo was in the same vicinity as the Risk Management Staff, Ms. Dembo was provided with direct access and supervision to her staff.

54.     Accordingly, as a result of this modified location, there was no legitimate business reason or justification for Ms. Dembo to be forced to meet with Ms. Colgan in the Toxic Location.   Nonetheless, Ms. Colgan continued to force Ms. Dembo to meet with her in the Toxic Location.

55.     This was the second time in less than one year that Risk Management Staff had been evacuated from the Toxic Location.

56.     In or about October 2006, the previous Director for Risk Management complained of physical ill-effects while working in the Toxic Location and therefore the Risk Management staff was relocated to a temporary location thru on or about March 20, 2007.   During Ms. Dembo's service as temporary Acting Director, on or about January 23, 2007 thru March 22, 2007, Ms. Dembo's office was also located away from the Toxic Location with the other Risk Management Staff.

57.     During these meetings that Ms. Dembo was forced to attend with Ms. Colgan, she sarcastically commented that, **"You seem perfectly fine"** and rolled her eyes.   Ms. Colgan further asked Ms. Dembo if she had "suggested" or instigated the Risk Management staff to also evacuate the Toxic Location.

58.     During a meeting held on or about June 12, 2007 with Ann Marie Benedicto, and the VP responsible for Environmental Safety,  to address the Risk Management staff complaints related to the Toxic Location, Ms Colgan again "rolled her eyes" when reviewing the staff complaint.

59.     On or about July 7, 2007, Ms. Dembo contacted Dr. Chassin and Anne Marie Benedicto to complain of the pattern of harassment and discrimination she was suffering at the hands of Ms. Colgan, specifically with respect to her physical disability.

60.     In response, Dr. Chassin promised Ms. Dembo, both verbally and in writing, that he would arrange to protect her and her employment, including, if necessary, to provide Ms. Dembo with direct report to someone other than Ms. Colgan.

61.     Dr. Chassin, however, told Ms. Dembo that he could not do it at that time and requested that she **"trust him on this one and be patient."**

62.     On or about July 17, 2007, Dr. Chassin called Ms. Dembo in for a meeting and told her that the problem that Ms. Colgan had with Ms. Dembo was that, **"You do not have enough of a presence at 19 East 98th Street and you refused to go to Ms. Colgan's office for meetings."**

63.     In response, Ms. Dembo explained to Dr. Chassin that, **"First of all, I never refused to attend any meetings with Ms. Colgan.  However,**

when Ms. Colgan would call meetings at her office located in the East 98th Street location [the Toxic Location], which was frequently, I reminded Ms. Colgan that the location of her office posed a serious health risk to someone with my disability. Ms. Colgan knew this. I nevertheless made every attempt to attend the frequent meetings she called in her office, though she knew that the reason my office is not located near hers is because of the reasonable accommodation Mount Sinai purportedly provided to me. It is unfair to now hold me accountable for not going to that building [the Toxic Location], when, in the Offer Letter Mount Sinai executed, they agreed to my accommodation. Mount Sinai agreed that I would not be required to go that building due to the fact that I had a disability secondary to toxic mold exposure resulting in an autoimmune disorder of Mixed Connective Tissue Disorder and Lupus, and the building's toxic make-up would make me ill."

64.    In response, Dr. Chassin shockingly admitted that he had, **"totally forgotten about the accommodation"** and stated that he would speak to Ms. Colgan about the already agreed upon accommodation.

13

65.     On or about September 20, 2007, Ms Colgan scheduled a 2½ hour meeting in the Toxic Building with a new Risk Management employee to discuss departmental business. Notably, on or about September 6th, 2007, and about 3 weeks prior to Ms. Dembo's unlawful termination, the Risk Management staff had been sent back the original offices at 19 East 98th street located in the Toxic Location.

66.     Immediately after that meeting, Ms. Dembo sent an email to Ms Colgan stating that she could not tolerate that space and was forced to take steroids after these meetings to counter ill-effects of the exposure such as asthma and skin rashes.

67.     In addition, Ms. Dembo informed Ms. Colgan that she could not tolerate the effects of the Toxic Location.  Ms. Dembo also informed Anne Marie Benedicto of the situation and showed her the visible skin rash all over her neck.

68.     Shockingly, on or about October 1, 2007, despite her prior conversations with Dr. Chassin and Ann Marie Benedicto,  Ms. Colgan sent Ms. Dembo an email informing me that, **"All future meetings will be held in Claudia's Office [in the Toxic Location]."**

69.     On October 5, 2007, days following Ms. Dembo's meeting with Dr. Chassin concerning her complaints regarding her disability and the ignorance of her accommodation, Ms. Dembo was called to a meeting with Ms. Colgan and Dr. Chassin.

70.     At the time, Ms. Dembo was informed by Ms. Colgan that despite the fact that she had performed excellent work, and had exceeded all of their expectations, it was determined that Ms. Dembo was **"just not a good fit"** and that her employment would be terminated.

71.     Accordingly, on October 5, 2007, Ms. Dembo was discriminatorily terminated without any notice, reason, justification or cause in retaliation of her legitimate good-faith complaints concerning discrimination based upon my physical disability.

14

72.     There is no legitimate business justification for Mount Sinai to refuse to accommodate Ms. Dembo's disability.

73.     Ms. Dembo was shocked and disappointed that Mount Sinai terminated her employment without "cause" rather than provide her with a reasonable accommodation.

74.     Ms. Dembo was disappointed by the actions of Mount Sinai, specifically, Dr. Chassin and Ms. Colgan, both of whom realized that it was easier for them to find another Director of Risk Management who did not have any physically disabilities that would restrict access to the Toxic Location (which has nothing to do with the fact that Ms. Dembo has consistently exceeded expectations) than to provide Ms. Dembo with a reasonable accommodation.

75.     Not only did Ms. Colgan acknowledge that Ms. Dembo **"exceeded expectations"** in the job, but Dr. Chassin very recently provided a potential employer with references that the potential employer characterized as **"glowing."**

76.     In addition, it is noteworthy that Ms. Dembo was working as the Director of Risk Management for Mount Sinai for several months on a temporary basis without complaint and in such an exemplary fashion that Mount Sinai recruited her to fill the job on a permanent basis.

77.     Accordingly, on or around October 5, 2007, Ms. Dembo was terminated because of her disability and in retaliation for asserting her right to a reasonable accommodation.

78.     Since her discriminatory and retaliatory termination, Ms. Dembo was unemployed for approximately nine months and although presently employed has been unable to secure comparable employment with respect to salary and benefits.

79.     Furthermore, prior to the commencement of this action, Ms. Dembo served a copy of this Complaint to the following persons at the last known address set forth in accordance with the New York City Administrative Code § 8-502(c):

Corporation Counsel of New York City      NYC Commission on Human Rights
100 Church Street, Room 4313              40 Rector Street, 9th Floor
New York, New York 10007                  New York, New York 10006


## CLAIMS AND DAMAGES

80.     Based upon the above allegations, Ms. Dembo  maintains the following legal claims against Defendant:

### COUNT ONE
#### (DISCRIMINATION IN VIOLATION OF ADA)

81.     Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

82.     Defendant discriminated against Plaintiff in violation of the ADA by denying her equal terms and conditions of employment, including, but not limited to, terminating her employment and failing to pay her earned wages, despite Plaintiff being fully qualified and at all times performing her duties in a professional and competent manner, because of Plaintiff's disability, because Defendants regarded Plaintiff as disabled, and/or because Plaintiff's record of disability.

83.     Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under ADA.

84.     These employment practices violate the ADA.

85.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADA, Plaintiff as suffered and continues to suffer monetary and/or

economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

86.     As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

87.     As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

88.     As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

89.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

**90.**     In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT TWO
### (VIOLATION OF DUTY OF REASONABLE ACCOMMODATION)

91.     Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

92.     Defendants violated their duty to provide Plaintiff with a reasonable accommodation under the ADA when it unilaterally rescinded an agreed-upon reasonable accommodation for Plaintiff's disabilities without any valid legitimate business justification for doing so, and without engaging in an interactive process with Plaintiff concerning her need to for a reasonable accommodation for her disabilities.

93.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the ADA, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

94.     As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

95.     As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

96.     As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

97.     As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

98.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT THREE
### (RETALIATION IN VIOLATION OF ADA)

99.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

100.    Defendants subjected Plaintiff to unlawful retaliation in violation of the ADA, including, but not limited to, terminating Plaintiff's employment in response to Plaintiff's request that she be reasonably accommodated for her disability and/or disclosure of her protected rights as a "qualified individual with a disability" and/or a "disabled employee" in the workplace.

101.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the ADA, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

102.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

103.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

104.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

105.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

106.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

107.    Defendants have retaliated against Plaintiff for having complained of disability discrimination in the terms and conditions of employment in violation of Section 704 of Title VII (42 U.S.C. § 2000e-3).

108.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

109.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

110.    As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

111.    As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered severe damages in the form of humiliation, embarrassment, emotional distress,

physical injury, as well as money damages including, but not limited to regular wages, overtime wages, retirement benefits, insurance benefits and pension.

112.    All of these damages have been exacerbated by the events surrounding Plaintiff's most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful termination.

## COUNT FOUR
### (DISCRIMINATION IN VIOLATION OF NYSHRL)

113.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

114.    Defendant discriminated against Plaintiff in violation of the NYSHRL by denying her equal terms and conditions of employment, including, but not limited to, terminating her employment and failing to pay her earned wages, despite Plaintiff being full qualified and at all times performing her duties in a professional and competent manner, because of Plaintiff's disability, because Defendants regarded Plaintiff as disabled, and/or because Plaintiff's record of disability.

115.    Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under NYSHRL.

116.    These employment practices violate the NYSHRL.

117.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

22

118.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

119.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

120.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

121.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

122.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT FIVE
### (VIOLATION OF DUTY OF REASONABLE ACCOMMODATION)

123.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

124.    Defendants violated their duty to provide Plaintiff with a reasonable accommodation under the NYSHRL when it unilaterally rescinded an agreed-upon reasonable

accommodation for Plaintiff's disabilities without any valid legitimate business justification for doing so, and without engaging in an interactive process with Plaintiff concerning her need to for a reasonable accommodation for her disabilities.

125.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYSHRL, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

126.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

127.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

128.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

129.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

130.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and

indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT SIX
### (RETALIATION IN VIOLATION OF NYSHRL)

131.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

132.    Defendants subjected Plaintiff to unlawful retaliation in violation of the NYSHRL, including, but not limited to, terminating Plaintiff's employment in response to Plaintiff's request that she be reasonably accommodated for her disability and/or disclosure of her protected rights as a "qualified individual with a disability" and/or a "disabled employee" in the workplace.

133.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYSHRL, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

134.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

135.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

136.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not

been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

137.   As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

138.   In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

139.   Defendants have retaliated against Plaintiff for having complained of disability discrimination in the terms and conditions of employment in violation of Section 704 of Title VII (42 U.S.C. § 2000e-3).

140.   Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

141.   Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

142.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

26

143.    As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered severe damages in the form of humiliation, embarrassment, emotional distress, physical injury, as well as money damages including, but not limited to regular wages, overtime wages, retirement benefits, insurance benefits and pension.

144.    All of these damages have been exacerbated by the events surrounding Plaintiff's most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful termination.

## COUNT SEVEN
### (DISCRIMINATION IN VIOLATION OF NYCHRL)

145.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

146.    Defendant discriminated against Plaintiff in violation of the NYCHRL by denying her equal terms and conditions of employment, including, but not limited to, terminating her employment and failing to pay her earned wages, despite Plaintiff being full qualified and at all times performing her duties in a professional and competent manner, because of Plaintiff's disability, because Defendants regarded Plaintiff as disabled, and/or because Plaintiff's record of disability.

147.    Defendant has undertaken these discriminatory practices willfully or with reckless disregard for the Plaintiff's rights protected under NYCHRL.

148.    These employment practices violate the NYCHRL.

149.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income,

compensation and benefits for which she is entitled to an award of monetary damages and other relief.

150.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

151.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

152.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

153.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

154.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT EIGHT
### (VIOLATION OF DUTY OF REASONABLE ACCOMMODATION)

155.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

156.   Defendants violated their duty to provide Plaintiff with a reasonable accommodation under the NYCHRL when it unilaterally rescinded an agreed-upon reasonable accommodation for Plaintiff's disabilities without any valid legitimate business justification for doing so, and without engaging in an interactive process with Plaintiff concerning her need to for a reasonable accommodation for her disabilities.

157.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the NYCHRL, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

158.   As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

159.   As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

160.   As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

161.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

162.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

## COUNT NINE
### (RETALIATION IN VIOLATION OF NYCHRL)

163.    Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

164.    Defendants subjected Plaintiff to unlawful retaliation in violation of the NYCHRL, including, but not limited to, terminating Plaintiff's employment in response to Plaintiff's request that she be reasonably accommodated for her disability and/or disclosure of her protected rights as a "qualified individual with a disability" and/or a "disabled employee" in the workplace.

165.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of the NYCHRL, Plaintiff as suffered and continues to suffer monetary and/or economic damages, including, but not limited to, lost of past and future income, compensation and benefits for which she is entitled to an award of monetary damages and other relief.

166.    As a further proximate result of Defendants' actions, Plaintiff has and will continue to suffer irreparable and significant damage to her personal and professional good name and reputation.

167.    As a further proximate result of Defendants' actions taken because of Plaintiff's disability, Plaintiff has and will continue to suffer severe and lasting embarrassment, humiliation and anguish and other incidental and consequential damages and expenses.

168.    As a result of the foregoing, Plaintiff is entitled to recover from Defendants an amount equal to the value of all compensation to be earned by Plaintiff had her employment not been interfered with, including all to be earned salary and bonuses, benefit payments, profit sharing, costs, attorney's fees and prejudgment interest at no less than 9%.

169.    As a result of the foregoing acts, Plaintiff is entitled to recover an amount no less than $3,000,000.00 in compensatory damages from Defendants in addition to all other amounts sought herein.

170.    In committing the acts alleged herein, Defendants willfully acted in an outrageous and malicious manner with intent, oppression, gross negligence, malice, wanton disregard and indifference for Plaintiff's protected civil rights, as part of a continuing pattern of conduct, and Plaintiff is entitled to punitive damages of at least $3,000,000.00 to adequately punish Defendants and to deter Defendants from continuing and repeating such conduct in the future.

171.    Defendants have retaliated against Plaintiff for having complained of disability discrimination in the terms and conditions of employment in violation of Section 704 of Title VII (42 U.S.C. § 2000e-3).

172.    Plaintiff acted in opposition to such unlawful conduct by making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

173.    Defendants had actual knowledge of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities.

174.   As a proximate result of Plaintiff's activities in respect of making good faith claims and/or complaints of disability discrimination to Defendants and appropriate authorities, Defendants engaged in adverse treatment of Plaintiff, including, inter alia, terminating her employment.

175.   As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered severe damages in the form of humiliation, embarrassment, emotional distress, physical injury, as well as money damages including, but not limited to regular wages, overtime wages, retirement benefits, insurance benefits and pension.

176.   All of these damages have been exacerbated by the events surrounding Plaintiff's most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful termination.

## COUNT TEN
### AGAINST DEFENDANT COLGAN (NYSHRL - AIDING AND ABETTING)

177.   Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

178.   As a result of the aforementioned actions, Defendant Colgan, who was Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of New York Executive Law § 290 et seq.

179.   As a result of the aforementioned actions, Defendant Colgan has violated the New York Executive Law §290 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

32

180.    As a result of Defendant Colgan discrimination (and aiding, abetting and inciting discrimination) against her, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT ELEVEN
### AGAINST DEFENDANT COLGAN (NYCHRL - AIDING AND ABETTING)

181.    Plaintiff incorporates by reference and realleges each and every allegation as set forth above as if fully set forth herein.

182.    As a result of the aforementioned actions, Defendant Colgan, who was Plaintiff's supervisor, knowingly or recklessly aided and abetted the unlawful employment practices, unlawful discrimination and/or unlawful retaliation against Plaintiff on account of her disability with respect to the terms, conditions and privileges of her employment in violation of New York City Administrative Code § 8-101 et seq.

183.    As a result of the aforementioned actions, Defendant Colgan has violated the New York City Administrative Code § 8-101 et seq. by aiding, abetting, inciting and coercing the unlawful discrimination outlined herein.

184.    As a result of Defendant Colgan's discrimination (and aiding, abetting and inciting discrimination) against him, Plaintiff has suffered damages, including, without limitation, deprivation of income and benefits, emotional pain, suffering, inconvenience, damage to reputation and career, mental anguish and humiliation.

## COUNT TWELVE
### (DISCRIMINATORY DISCHARGE)

185.   Plaintiff repeats, realleges, and incorporates by reference each and every allegation previously made herein as if the same were more fully set forth at length herein.

186.   Defendants have unlawfully arid intentionally discharged Plaintiff based on her disability in violation of ADA, NYSHRL and NYCHRL.

187.   As a result of the Defendants' wrongful actions complained of herein. Plaintiff has suffered severe damages in the form of humiliation, embarrassment, emotional distress, physical injury, as well as money damages including, but not limited to regular wages, retirement benefits, insurance benefits and pension.

188.   All of these damages have been exacerbated by the events surrounding Plaintiff's most recent discrimination, retaliation, hostile environment, disparate treatment and unlawful termination.

## ATTORNEY'S FEES AND COSTS

189.   Attorney's fees and costs are warranted in this matter as the undersigned, on behalf of Plaintiff have in good faith, attempted to negotiate a reasonable resolution with Defendant without having to refer this matter to this forum for adjudication, determination and final resolution on the merits.

## PUNITIVE DAMAGES – BAD FAITH

190.   It is presumed that parties to contracts undertake their respective obligations in good faith, with intent to deal fairly.  In light of Defendants' obvious and blatant bad faith, wrongdoing and breach of other duties, *punitive damages* should be assessed against Defendants so that they be deterred from attempting such harmful employment practices in the future.

34

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests that this Court order the following relief in favor of Plaintiff:

I.     A Declaratory Judgment declaring that the acts complained of herein violate the rights of Plaintiff as guaranteed under ADA, NYSHRL and NYCHRL;

II.    A judgment granting equitable relief directing Defendants to cease and desist from exposing Plaintiff to discrimination and retaliation;

III.   A judgment directing Defendants to reimburse and make Plaintiff whole for any and all earnings she would have received but for Defendants' discriminatory treatment and unlawful dismissal, including but not limited to, back pay and pension benefits;

IV.   A judgment awarding Plaintiff compensatory damages for mental anguish, loss of dignity, humiliation, and injury to livelihood in an amount that is fair, just, and reasonable, to be determined at trial, including reasonable attorneys' fees, as provided under ADA, but not less than $3,000,000.

V.    A judgment awarding Plaintiff double damages for Plaintiff's intentional discrimination;

VI.   A judgment awarding Plaintiff front pay;

VII.  A judgment awarding Plaintiff punitive damages;

VIII. An award of prejudgment interest, costs and attorney's fees; and

IX.   Such other and further relief that the Court may deem just and proper.

35

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated:      New York, New York
            March 26, 2010

                            Respectfully submitted,

                            **SACK & SACK, ESQS.**

                            By:    _____
                                    Jonathan Sack, Esq.  (JSS 1835)
                            **Attorneys for Plaintiff**
                            **PHYLLIS DEMBO**
                            110 East 59th Street, 19th Floor
                            New York, New York 10022
                            Tel.: (212) 702-9000
                            Fax: (212) 702-9702

36

**EXHIBIT A**



MOUNT SINAI
SCHOOL OF
MEDICINE

*The Department of Health Policy*
Mount Sinai School of Medicine

*The Office of the Executive Vice President*
*for Excellence in Patient Care*
The Mount Sinai Medical Center

One Gustave L. Levy Place, Box 1077
New York, NY 10029-6574
(212) 659-9567
(212) 423-2998 – Fax

March 21, 2007

Phyllis Dembo
330 West 56th Street
New York, NY 10019

Dear Ms. Dembo:

It gives me great pleasure to offer you the position of Director of Risk Management, Regulatory, and Insurance Affairs for The Mount Sinai Medical Center. You will be reporting to Claudia Colgan, RN, Vice President for Quality Initiatives.

Your employment—as is the case with respect to all candidates for employment at Mount Sinai—is contingent upon satisfactory completion of a background screening, a toxicology screening, and a health screening by a Mount Sinai Employee Health Service practitioner. Michael Impollonia, MSN, RN, CNA, BC, Manager of Nursing Recruitment and Retention (212-731-3433) will walk you through this process. Your employment is also contingent on the receipt of appropriate medical documentation outlining your condition and office space requirements, as well as Mount Sinai's ability to reasonably accommodate you.

The Mount Sinai Medical Center is a 1,171-bed teaching hospital that draws patients from surrounding communities, across the country, and around the world. Mount Sinai is internationally acclaimed for excellence in clinical care, education, and scientific research in nearly every aspect of medicine.

As Director of Risk Management, Regulatory, and Insurance Affairs, you will be part of a leadership team responsible for determining proactive methodologies to continue a culture of patient safety and risk reduction within Mount Sinai, analyze trends of events to establish process improvements, and ensure alignment of patient safety strategies with the organization's mission, vision, and goals. You will conduct clinical risk management activities, coordinate the investigation and evaluation of incidents, oversee legal and insurance activities associated with risk management, provide risk management advice and educational programs to members of the medical community, develop hospital-wide policies related to risk management and regulatory compliance, coordinate claims and claims settlement, supervise, and mentor Risk Management staff.

Training, direct supervision and monitoring work performance of Risk Management staff are important responsibilities of the Director. Your workspace will not be in 19 East 98th Street, which is where Risk Management staff is currently located. Thus, adaptive measures are

Ms. Phyllis Dembo
March 21, 2007
Page 2 of 2

required that will still allow you to directly monitor, coach, and supervise their work. These include, but are not limited to, weekly staff meetings, set office hours, and one-on-one work with staff. In addition, your job responsibilities include attending meetings and investigating occurrences throughout the Medical Center.

Your initial salary will be $152,500. This will be your base salary for purposes of benefits computations. You will be subject to a 6-month probationary period. You will be paid a $7,500 bonus following the successful completion of probation, bringing your compensation to $160,000 in your first year with us. In addition, you are eligible for a $7,500 performance-based bonus per year in subsequent years, for a total annual compensation of $160,000. Performance-based bonuses are paid based on the accomplishment of specific targets.

You and your supervisor, Claudia Colgan, will set performance metrics every year, including your initial year with us. These metrics will be your targets and, in subsequent years, the payment of your bonus will be contingent on completion of these targets.

If you are in agreement with the terms outlined in this letter, please sign and return one copy, and retain the second one for your files. I look forward to hearing from you.

Sincerely,

Anne Marie S. Benedicto, M.P.H., M.P.P.
Administrator

cc:    Mark Chassin, M.D., M.P.P., M.P.H.
       Claudia Colgan, RN


I accept the terms and conditions set forth in this letter.

UNTIED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                    Civ No. _____

---

**PHYLLIS DEMBO,**

Plaintiff,

- against -

**MOUNT SINAI HOSPITAL and CLAUDIA COLGAN, individually,**

Defendants.

---

**COMPLAINT**

---

**SACK & SACK, ESQS.**

**ATTORNEYS FOR PLAINTIFF**

110 East 59th Street, 19th Floor
New York, New York 10022
Tel.: (212) 702-9000
Fax: (212) 702-9702
